# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

ANTHONY P. COLLINS,

          **Plaintiff,**

**and**

MARIA PHILLIPS-COLLINS,

          **Involuntary Plaintiff,**

v.                                    **Case No. 06-C-801**

STATE FARM FIRE AND
CASUALTY COMPANY,
a/k/a STATE FARM INSURANCE,

          **Defendant.**

---

# DECISION AND ORDER

---

       Plaintiff Anthony P. Collins ("Collins") commenced this action against Defendant State Farm Fire and Casualty Company, a/k/a State Farm Insurance ("State Farm") in the Circuit Court for Milwaukee County, Wisconsin. Pursuant to 28 U.S.C. § 1441 and § 1446, State Farm removed the action to federal district court based on diversity jurisdiction afforded by 28 U.S.C. § 1332, because the parties are citizens of different states and the amount in controversy is in excess of $75,000, exclusive of interest and costs. Venue is proper under 28 U.S.C. § 1441(a). The action was randomly assigned to this Court.

       Subsequently, the Court granted Collins's motion for leave to amend the complaint to add his wife, Maria Phillips-Collins ("Phillips-Collins"), as an involuntary

plaintiff. Phillips-Collins was served with the amended complaint ("complaint") by publication. To date, she has not appeared in this action.

This action arises out of an insurance claim made by Collins and Phillips-Collins (the "claim" or the "Collins claim") in the aftermath of a June 25, 2005, fire at a Duplex located at 2736-37 North 26th Street, Milwaukee, Wisconsin ("Duplex"). Collins and Phillips-Collins owned the Duplex and had a homeowner's policy issued by State Farm on the Duplex. The complaint alleges that State Farm breached its contract under the homeowners policy (first claim) and acted in bad faith in denying Collins's claim (second claim).

The matter is before the Court on State Farm's motion for summary judgment. Only Collins has responded to the motion. The motion is now addressed.

## APPLICABLE STANDARD

When considering a motion for summary judgment, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A party "opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Doe v. Cunningham*, 30 F.3d 879, 883 (7th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248; also citing *Celotex Corp.*, 477

U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *United States v. Rode Corp.*, 996 F.2d 174, 178 (7th Cir. 1993)).

"Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden of showing the needlessness of a trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. In determining whether a genuine issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587.

Failure to respond to a summary judgment motion does not automatically result in judgment against the non-moving party. *See Cunningham*, 30 F.3d at 883. "A party is never required to respond to a motion for summary judgment in order to prevail since the burden of establishing the nonexistence of a material factual dispute always rests with the movant." *Id.* (citations omitted).

### *PRELIMINARY MATTERS*

Before setting forth the relevant facts, the Court must resolve preliminary issues raised by the parties relating to the proposed findings of fact. State Farm objects to Collins's responses to its proposed findings of fact. (*See e.g.*, Pl.'s Resp. Def.'s Proposed Finding of Fact ("PFOF") ¶¶ 3, 9.) State Farm argues that Collins has failed to propose his own facts in separately numbered paragraphs.

3

Civil Local Rule 56.2(b)(2)(E.D. Wis.) is explicit in its requirement that:

> A party opposing a motion may present additional factual propositions deemed to be relevant to the motion, in accordance with the procedures set out in Subparagraph (a)(2) of this rule. These propositions may include additional allegedly undisputed material facts and additional material facts which are disputed and which preclude summary judgment.

Subparagraph (a)(2) of Civil Local Rule 56.2 states "[f]actual propositions must be set out in numbered paragraphs, with the contents of each paragraph limited as far as practicable to a single factual proposition."

Collins's inclusion of additional proposed findings of fact within his responses to State Farm's proposed findings of fact is inconsistent with the procedure established by Civil Local Rule 56.2. Additional proposed findings of fact which only appear in Collins's responses to State Farm's proposed findings of fact do not comply with the procedure for summary judgment motions set forth in Civil Local Rule 56.2(b) and have not been included as relevant facts.

Collins has also filed a separate document setting forth his proposed findings of fact. State Farm objects to some of those proposed findings of fact because they cite an entire deposition or an entire affidavit. State Farm also objects to Collins's proposed findings of fact that cite the deposition of Cheryl Spain ("Spain"), the section manager of State Farm's Special Investigations Unit ("SIU") for two reasons: (1) the deposition is not included in the evidentiary materials before the Court, and (2) Collins has cited the entire deposition.

Subparagraph (a)(2) of Civil Local Rule 56.2 requires that, absent a stipulation of facts by the parties, proposed findings of fact be supported by "specific" citations to

4

"evidentiary materials in the record." Absent State Farm's agreement to a proposed fact, Collins's proposed findings of fact which cite an entire deposition or an affidavit or the Spain deposition are not properly supported and have not been included in the relevant facts.

Collins disputes State Farm's findings of fact which summarize letters sent by State Farm setting forth the obligations of Collins and Phillips-Collins under the homeowners policy. (*See e.g.*, Pl.'s Resp. Def.'s PFOF ¶¶ 103, 107.) Collins admits that he received the letters in question but disputes that he had a "duty" to provide documents to State Farm for a variety of reasons. These responses to these findings are argumentative and draw legal conclusions. Collins has not established the existence of genuine disputes of material fact about the content of such letters sent by State Farm.

Collins also disputes State Farm's characterization of his proof of loss as "incomplete." (*See* Pl.'s Resp. Def.'s PFOF ¶ 113.) Such characterization is a conclusion, not a fact, and has not been included in the statement of facts. Legal conclusions or unsupported factual conclusions are not facts and have not been included in the statement of relevant facts. Likewise, attempts to raise factual disputes which are not supported by the cited factual materials have been disregarded.

State Farm objects to portions of Collins's affidavit in opposition to the summary judgment motion. State Farm contends that statements in that affidavit which conflict with either Collins's prior deposition testimony or his July 7, 2005, statements to John Perreault ("Perreault"), a claims representative in State Farm's SIU, are improper. A party cannot defeat summary judgment by creating "sham issues of fact with affidavits that contradict their prior

depositions." *Ineichen v. Ameritech*, 410 F.3d 956, 963 (7th Cir. 2005). Thus, "when a deposition and an affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Velez v. City of Chi.*, 442 F.3d 1043, 1049 (7th Cir. 2006) (quoting *Amadio v. Ford Motor Co.*, 238 F.3d 919, 926 (7th Cir. 2001)).

One such conflict relates to the year that Phillips-Collins and Collins purchased the Duplex. At his August 17, 2007, deposition, Collins testified that he purchased the Duplex in 1999. (Covelli Aff. ¶ 2, Ex. A (Collins Dep.) 75:23–77:5; 79:8-80:23.) Collins also provided the 1999 purchase date in his July 5, 2005, recorded statement to State Farm. (Perreault Aff. ¶ 7, Ex. B at 13.) However, in his October 9, 2007, affidavit opposing summary judgment, Collins states that before he purchased the Duplex in March 2005, it was owned by Attorney Jerome Randall ("Randall") (or a company he owned called Bel-Aire Rentals ("Bel-Aire")). (Collins Aff. ¶ 25). Because Collins's affidavit asserting a March 2005 purchase of the Duplex conflicts with Collins's prior sworn testimony that he purchased the Duplex in 1999, it does not create an issue of fact as to the 1999 purchase of the Duplex.

# RELEVANT FACTS [1]

## *Parties and Premises*

Collins and Phillips-Collins are married and owned the Duplex, which consisted of a basement, a first-floor unit, a second-floor unit, and a third floor walk-up attic.  As of October 2007, Collins and Phillips-Collins had lived separately for several years.  Despite their personal differences, they remain married because of their religious beliefs.  Collins and Phillips-Collins operate a small church, Shabach Worldwide Ministries, Inc. ("Shabach"), founded by Collins.

On  June 25, 2005, a fire destroyed the Duplex, and it had to be torn down.  Shortly after the fire, Collins informed State Farm that he, Charles Phillips ("Phillips"), Prentiss Williams ("Williams"), and Andrew Phillips ("Andrew")[2] resided in the first-floor unit.[3]  Williams is Collins's biological son.  Phillips and Andrew are Phillips-Collins biological sons.

---

[1]Unless otherwise stated, the relevant facts are based on State Farm's proposed findings of fact ("Def.'s PFOF") and Collins's proposed findings of fact ("Pl.'s PFOF") to the extent they are undisputed.  However, citations to quoted excerpts are included even if they are undisputed.

[2]In referring  to Phillips-Collins's son as Andrew, the Court has departed from its usual practice of referring to all individuals by their surnames because this action involves related individuals who have the same surnames.  To differentiate between individuals with the same surname, after referring to one individual by their surname, the Court has referred to all others with the same surname by their given name.  No disrespect is intended.

[3]There is a factual dispute between the parties about whether Collins also stated that Phillips-Collins and two of Andrew's children resided in the first-floor unit.

Case 2:06-cv-00801-RTR   Filed 02/28/08   Page 7 of 54   Document 75

*The Policy*

State Farm issued a homeowners policy to Collins and Phillips-Collins on the Duplex. The initial term on the policy was from March 18, 2005, to March 18, 2006. State Farm was promptly notified of the fire loss on June 28, 2005.

Collins and Phillips-Collins purchased Coverage A for the dwelling with a limit of liability of $198,900 and Coverage B personal property with a limit of liability of $149,921. The policy was written on policy form FP-7955 and endorsements FE 5320, FE 5398, FE 5452. The mortgagee listed on the policy was Option One Mortgage Corp., its successors and assigns.

**COVERAGE A - DWELLING**

1.  **Dwelling.** We cover the dwelling used principally as a private residence on the **residence premises** shown in the **Declarations.**

                                 * * * *

**COVERAGE B - PERSONAL PROPERTY**

1.  **Property Covered.** We cover personal property owned or used by an **insured** while it is anywhere in the world.

                                 * * * *

**COVERAGE C - LOSS OF USE**

1.  **Additional Living Expense.** When a Loss Insured causes the **residence premises** to become uninhabitable, we will cover the necessary increase in cost you incur to maintain your standard of living for up to 24 months. Our payment is limited to incurred costs for the shortest of: (a) the time required to repair or replace the premises; (b) the time required for your household to settle elsewhere; or (c) 24

months. This coverage is not reduced by the expiration of the policy.

2. **Fair Rental Value.** When a Loss Insured causes that part of the **residence premises** rented to others or held for rental by you to become uninhabitable, we will cover its fair rental value. Payment shall be for the shortest time required to repair or replace the part of the premises rented or held for rental, but not to exceed 12 months. This period of time is not limited by expiration of the policy. Fair rental value shall not include any expense that does not continue while that part of the **residence premises** or held for rental is uninhabitable.

\* \* \* \*

## SECTION I - LOSSES INCURRED

## COVERAGE A - DWELLING

We insure for accidental direct physical loss to the property described in Coverage A, except as provided in **SECTION I - LOSSES NOT INSURED.**

## COVERAGE B - PERSONAL PROPERTY

We insure for accidental direct physical loss to property described in Coverage B caused by the following perils, except as provided in **SECTION I - LOSSES NOT INSURED:**

1. **Fire or lightening.**

\* \* \* \*

## SECTION I - CONDITIONS

\* \* \* \*

2. **Your Duties After Loss.** After a loss to which this insurance may apply, you shall see that the following duties are performed.

\* \* \* \*

9

c.      prepare an inventory of damaged or stolen personal property. Show in detail the quantity, description, age, replacement cost and amount of loss. Attach to the inventory all bills, receipts and related documents that substantiate the figures in the inventory.

d.      as often as we reasonably require:

    (1)    exhibit the damaged property;

    (2)    provide us with records and documents we request and permit us to make copies;

    (3)    submit to and subscribe, while not in the presence of any other **insured**;

        (a) statements; and

        (b) examinations under an oath; and

    (4)    produce employees, members of the **insured's** household or others for examination under oath to the extent it is within the **insured's** power to do so; and

    (5)    submit to us, within 60 days after the loss, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

        (1)    the time and cause of loss;

        (2)    interest of the **insured** and all others in the property involved and all encumbrances on the property;

        (3)    other insurance which may cover the loss;

(4)     changes in title or occupancy of the property during the term of this policy;

(5)     specifications of any damaged building and detailed estimates for repair of the damage;

(6)     an inventory of damaged or stolen personal property described in 2.c.;

(7)     receipts for additional living expenses incurred and records supporting the fair rental value loss; and

\* \* \* \*

12.     **Intentional Acts.** If you or any person insured under this policy causes or procures a loss to property covered under this policy for the purpose of obtaining insurance benefits, then we will not pay you or any other **insured** for this loss.

**SECTION I AND II - CONDITIONS**

\* \* \* \*

2.     **Concealment or Fraud.**

a.     We do not provide coverage for you or any other **insured**, if you or any other **insured** has concealed or misrepresented any fact or circumstance relating to this insurance, whether before or after a loss.

However, this Condition applies only to facts or circumstances:

(1)     on which we rely and are either (a) material; or (b) made with intent to deceive; or

(2)     which contribute to the loss.

(Covelli Aff. ¶ 4, Ex. C 3-20 & FE-7249.8.)

### *Denial of Coverage for the Loss*

By letter dated April 11, 2006, State Farm notified Douglas Dehler ("Dehler"),

Collins's legal counsel, that State Farm:

> [A]fter careful consideration and advice from independent legal counsel, found it necessary to deny your client's claim for insurance proceeds as a result of the fire occurring June 25, 2005. As you know, State Farm has conducted a thorough investigation of this incident including conducting several Examinations Under Oath. On the basis of our investigation, we have concluded the fire of June 25, 2005 was incendiary in origin, and your client or their agents were responsible. This intentional act violates policy provisions, and is grounds for a denial of the entire claim.
>
> Please be advised that while we are denying your client's claim, State Farm has honored the single interest claim of the mortgage company. While it is within State Farm's rights to take an assignment of the mortgage, we do not plan to do so at this time.

(Spain Aff. ¶ 13, Ex. E 1.)

> The letter also stated:
>
> As separate and independent grounds for denial, State Farm has concluded that your client engaged in fraud and false swearing in their claim and Examinations Under Oath. Fraud and false swearing violate the terms of the insurance contract provisions.
>
> As separate and independent grounds for denial, State Farm has concluded that your clients concealed or misrepresented material facts and circumstances concerning this insurance and the loss. Concealment or misrepresentation of material facts and circumstances violates the terms of the insurance contract provisions.
>
> As separate and independent grounds for denial, State Farm concluded that your clients failed to provide requested documents

and failed to cooperate in the insurance claim process in violation
of the terms of the insurance contract provisions.

(*Id.*, Ex. E 3.)

### Bases for Denial

State Farm retained Terrance Sheppard ("Sheppard"), a fire investigator certified by the International Association of Arson Investigators, to identify, if he could, the area or origin and cause of the June 25, 2005, fire. Sheppard has investigated the origin and cause of fires for the Chicago Fire Department since 2000 and as a private investigator since 2001. Sheppard has conducted almost all of those private investigations for insurance companies.

On July 1, 2005, Sheppard inspected, photographed, and retained evidence from the fire scene. After his July 1, 2005, inspection, Sheppard gave his oral opinion to State Farm that the origin of the fire was on top of a mattress which was positioned on top of a box spring in the northeast (rear) bedroom of the first-floor unit.

Upon Sheppard's recommendation, an electrical engineer, Beth Anderson ("Anderson"), was retained to determine whether the fire in that area had an electrical source. Anderson is a registered professional engineer with Bachelor of Science and Master of Science degrees in electrical engineering. For over 20 years, Anderson has been investigating and rendering opinions on whether electrical systems and appliances played a role in causing fires.

On July 8, 2005, Sheppard and Anderson inspected the fire scene, took photographs and retained artifacts. After analyzing the retained artifacts and photographs at

Case 2:06-cv-00801-RTR   Filed 02/28/08   Page 13 of 54   Document 75

her office, Anderson opined that the electrical system and appliances in the house played no role in the cause of the fire.[4]

Based on his inspection and analysis of Anderson's opinion that the electrical system and appliances played no role in the cause of the fire, Sheppard opined that the fire was incendiary. Sheppard and Anderson originally reported their opinions to State Farm orally.[5] Later, they both confirmed their opinions in writing.[6]

*The Insured's Opportunity*

The fire was discovered and the fire alarm turned in at about 11:00 p.m. on Saturday, June 25, 2005. Collins stated that Andrew, Phillips, and Williams lived with him in the lower unit.

Phillips left the Duplex at 8:00 or 8:30 p.m. on the night of the fire. When Phillips departed, no one was in the first-floor unit and the unit was secured and locked.

Andrew, a non-smoker as of the date of the fire, was the last person in the first-floor unit before the fire was discovered. Andrew stated that he had been in the first-floor unit waiting for someone to pick him up. Andrew was alone in the first-floor unit except for

---

[4]Collins attempts to dispute the adequacy of Anderson's analysis of the 6-foot floor lamp which was plugged into an electrical outlet in the northeast bedroom. Collins relies upon the findings and conclusions of Theodore J. Pagels ("Pagels"), a professional fire and explosion cause and origin investigator whom he retained. (Pl.'s Resp. to Def.'s PFOF ¶ 22.) However, Collins has not presented additional proposed findings of fact incorporating those findings and opinions.

[5]Neither the proposed finding of fact upon which this statement is based nor the cited supporting evidentiary material disclose the date of the oral reports to State Farm. (*See* Def.'s PFOF ¶ 24 (citing Sheppard Aff., Ex. B and Anderson Aff., Ex. B).)

[6]Sheppard avers that he prepared his written report on September 25, 2005, and that before he prepared that written report Anderson "orally advised him that electricity did not play a role in causing the fire." (Sheppard Aff. ¶¶ 6-7.) Anderson's initial written report is dated October 25, 2005. (Anderson Aff. ¶ 3, Ex. B.)

14

his infant daughter. Andrew could not estimate how long he was in the first-floor unit because he had been talking on his cell phone while he was waiting.

Collins brought Phillips back to the Duplex about 15 to 30 minutes before the fire was discovered. Collins dropped Phillips off and walked onto the front porch with Phillips. Thus, Collins was at the Duplex 15 to 30 minutes before the fire's discovery. Andrew was on the front porch when Collins and Phillips arrived.

When Phillips and Collins arrived at the Duplex, Andrew went out the front door to meet them. Andrew asked Collins for a ride, when his ride failed to show up.[7] Andrew left with Collins about 20 to 25 minutes before the fire was discovered.

Andrew did not indicate that there was smoke or a fire in the lower unit when he left it. Andrew said that the first-floor unit was secured with the windows shut and the doors locked when he left on the night of the fire.

Phillips stated that he did not enter the first-floor unit and remained on the porch the entire 15 to 30 minutes before someone told him that the Duplex was on fire. Phillips then went around the side of the Duplex and saw flames coming out of the rear of the Duplex.

According to Phillips, Williams would be gone from the Duplex for days at a time, stop by to change clothes, and again be gone for days at a time. Phillips said that Williams left the Duplex at about 4:00 or 5:00 p.m. and was at one of his girlfriend's house the night of the fire. Phillips did not see Williams at the Duplex that night until after the fire had been discovered.

---

[7]There is a factual dispute between the parties whether Andrew called Collins and requested a ride or whether Andrew asked Collins for a ride when Collins brought Phillips to the Duplex. The dispute is not material.

According to Collins, Williams told him that he was not home the night of the fire. According to Andrew, Williams had not been at the Duplex for a couple of hours before Andrew left the Duplex with Collins 20 to 25 minutes prior to the discovery of the fire.

*The Insured's Motive*

Collins and Phillips-Collins purchased the Duplex in 1999. Collins did not make a large lump sum down payment for the Duplex. Until March 11, 2005, Collins had monthly payments of $300, which he made regularly "at one point." (Covelli Aff. ¶ 2, Ex. A 79:8-14.)

When Collins and Phillips-Collins first purchased the Duplex, Phillips lived in the first-floor unit and the upper unit was rented. Phillips-Collins never lived at the Duplex. Collins and Phillips-Collins began living apart about one year before the fire.

Perreault investigated the extent to which Collins resided in the lower unit. Collins's July 5, 2005, recorded statement,[8] responding to Perreault's questions, states:

> Q. Charles is saying maybe week, week-and-a half- out of the, out of the month you may stay there. You're either out doing your preaching work . . .
>
> A. (Wife) Mm,hmm.
>
> Q. Or you're staying elsewhere.
>
> A. A lot of, a lot of that's true.
>
> A. (Wife) That's true.
>
> A. I stay there but I see to her, I see to my church.
>
> A. (Wife) No, no, no, No, let me tell him. The majority of his things is at his house on 26th.

_____

[8]Phillips-Collins was also present and responded in the recorded statement.

16

A. Oh, that's where my living is.

* * *

Q. Okay. Do you agree with your son [Phillips] that [in] a given month, you're there maybe a week to a week-and-a-half?

A. I think I'm there a little bit more than that. See, what, well, really I'm there every day. I just don't stay in the house every day.

(Perreault Aff. ¶ 7, Ex. B at 11-12.)

Phillips, July 5, 2005, recorded statement, responding to Perreault's questions states:

Q: Well, if [Collins] [is] not on convention, where does he stay? Where, where, where does his mail go? His mail come to the house?

A: He lives at 2736 North 26th Street.

(*Id.* at Ex. A 6-7.) In responding to a question about what furniture and other items were in Collins's bedroom, Phillips stated "He, he had a closet, like I say he was, really never basically here, you know what I'm saying." (*Id.* at Ex. A 11.) Phillips also stated that in a "[g]iven month, I'd say my dad was there a week, week-and-a-half out of each month." (*Id.*)

On March 11, 2005, Collins closed on a $53,250 mortgage loan on the Duplex. The note required that he pay a minimum of 10.6% interest but not more than 13.6% interest. Collins's mortgage payment would be at least $491.05 per month beginning on May 1, 2005, and ending on April 1, 2035. Collins was required to pay $16,597 in back taxes on the Duplex, closing costs, and $2,500 to pay off the seller. After the closing, the net loan proceeds to Collins were $30,981.41.

17

Collins did not have any fire insurance on the Duplex when he applied for the loan. Collins's prior fire insurance on the property was cancelled after his insurer had to pay claims on a policy for another property on 15th Street in Milwaukee which had been "arsoned" by Collins's tenants. (Covelli Aff. ¶ 2, Ex. A, Dep. Ex. 1 54-55.)

To obtain the mortgage loan for the property, Collins was required to have proof of insurance with limits at least equal to the amount of the loan. Collins obtained a homeowner's policy from State Farm with $198,900 of coverage on the Duplex and $149,921 of coverage on the personal property within the Duplex.

On March 17, 2005, Collins deposited $25,338.41 of the loan proceeds in the checking account for Shabach. Collins stated that as of the date of the fire all of the loan proceeds had been spent. By the June 25, 2005, date of the fire, Shabach's account balance was $2,259.30 and Collins's personal checking account balance was $474.38.

Collins had not been gainfully employed since 1999. Collins did not file income tax returns for 2003, 2004, or 2005. Collins filed homestead exemption forms for those years.

Collins had received social security disability benefits since 1984 or 1985. The Social Security Administration reduced the amount of Collins's social security benefits because it said that he had been overpaid $20,000 to 30,000 in benefits. During some months of 2005, instead of receiving more than $600, Collins's benefits were reduced to less than $300.[9] From January 2005 through the date of the fire, Collins's monthly social security check

---

[9]This statement is based on paragraph 70 of State Farm's proposed findings of fact. Collins attempts to raise a factual dispute relying upon paragraph 29 of his affidavit. But, he cannot defeat summary judgment by creating "sham issues of fact" with an affidavit that contradicts his prior deposition testimony. *Ineichen*, 410 F.3d at 963.

was only $500 on a couple of occasions. Collins stated that he deposited his social security checks and rent receipts into his bank account.

Collins received no income from Shabach. Rather, he used his social security checks to finance the church's gas, light and rent bills. Collins placed his loan proceeds in Shabach's account because he wanted to make sure that the church had enough money to pay its rent. Collins said he viewed the loan proceeds as his money to do with as he pleased. During a trip to California, Collins purchased clothes, including two pairs of alligator shoes for $1,400, with those proceeds.

When Collins received his loan proceeds, WEPCO (Wisconsin Electric Power Company)[10] had a $15,000 judgment against Collins.[11] Collins did not pay off the judgment with his loan proceeds and it remained outstanding at the time of the fire.

In his July 5, 2005, statement, Collins stated that he was receiving $500 per month in rent for the upper unit at the time of the fire. (Perreault Aff. ¶ 7, Ex. B 23). Collins raised the rental payment a couple of months earlier. (*Id*.) Prior to the rent increase, the monthly rent was $425. (*Id*.)

In his October 19, 2005, examination under oath, Collins stated that the second-floor unit was occupied by a person named Ken Dog ("Dog"). (Covelli Aff. ¶ 2, Ex. A 58.)

---

[10]Wisconsin Electric Power Company, which does business as We Energies, provides electrical service for over one million customers, primarily located in southeastern and eastern Wisconsin as well as the Upper Peninsula of Michigan. *See* http://en.wikipedia.org/wiki/Wisconsin_Energy_Corporation (last visited Jan. 10, 2008).

[11]Such statement is based on paragraph 76 of State Farm's proposed findings of fact. Collins attempts to dispute the statement relying upon paragraph 25 of his affidavit indicating that he did not own the Duplex when the bills were incurred. However, as previously stated, Collins cannot overcome summary judgment by creating "sham issues of fact" with an affidavit that contradicts his prior testimony that he purchased the Duplex in 1999. *See Ineichen*, 410 F.3d at 963.

State Farm asked Collins to provide Dog's full name, address or contact information, and any documentation that would substantiate the rent that Collins said he was receiving.

Latoya Green ("Green") is the sister of Elrico and Karen Green ("Elrico" and "Karen"). Collins adopted Elrico and Karen. Green lived with Collins and Phillips-Collins before they separated.

On July 5, 2005, Phillips said that Green was the upstairs tenant at the time of the fire. On February 28, 2006, Phillips stated that he had never heard of and did not know Green.

On October 19, 2005, Phillips-Collins stated that Green was the upstairs tenant at the time of the fire. Phillips-Collins was in contact with Green and received a telephone call from her on October 19, 2005.

On October 19, 2005, Collins stated that Green was the upstairs tenant at the time of the fire but later changed that to an unknown woman named "LaTonya."

Collins said that he received $200 and sometimes $250 in rent from Phillips.

Shortly after the fire, Paul Cralle ("Cralle"), a claims representative with State Farm, and Perreault each visited the scene and observed the contents of lower duplex.[12] During his visit to the scene, Perreault observed that many of the electronic appliances found in and outside the first-floor duplex had their electrical supply cords cut.

---

[12]There is a factual dispute between the parties regarding the contents of the lower unit when the fire occurred. (*Compare* Def.'s PFOF ¶ 94 and Pl.'s Resp. Def.'s PFOF ¶ 94.)

*Concealment or Fraud*

On July 5, 2005, State Farm took the recorded statement of Collins. Collins stated that he slept at his church that Friday night and performed the 6:00 a.m. church service on the Saturday morning of the fire. At Collins's October 19, 2005, examination under oath, Collins said that he was in Chicago, Illinois on Friday night and returned to Milwaukee from Chicago on the Saturday of the fire.

During Phillips's examination under oath, Phillips initially stated that there was no extension cord running to the neighbor's house. Then, after a break in his examination, Phillips stated that there was a cord. At the time of Phillips's examination under oath there was a question as to whether the cord was a cause of the fire.

Collins initially stated he had produced all his bank records but later produced bank records for an account in the name of Shabach into which Collins deposited his personal funds.

*Failure to Cooperate*

On June 28, 2005, State Farm advanced Collins $2,000 and told him that he needed to provide receipts to show how he spent the money.

21

Collins received a letter addressed to him and Phillips-Collins dated July 6, 2005, at his post office box. The letter, sent by Perreault, quotes language from the homeowners' policy regarding the insured's duties after a loss and requested that they:

> 1. submit personal property inventory forms detailing all of the personal property they claimed as lost or damaged in the fire on forms provided with the letter;

> 2. provide receipts, bills, or other documentation evidencing the purchase of the items shown on their personal property inventory forms;

> 3. submit a complete sworn proof of loss on the form provided with the letter;

> 4. provide copies of their 2003 and 2004 federal and state income tax records;

> 5. provide a credit report on themselves and State Farm would reimburse them for the cost of obtaining the reports;

> 6. monthly bank statements for all banking accounts held by either of them for the period of July 2004 through July 2005;
> 7. all documentation regarding the mortgage on the property and all documentation regarding the expenditure and location of the proceeds from that loan;

> 8. any other documents that Collin and Phillips-Collins believe is pertinent to State Farm's investigation and their claim; and,

> 9. documentation of the rent that they were receiving prior to the fire.

Perreault wrote Phillips-Collins and Collins on July 12, 2005, enclosing a draft in the amount of $2,525.00, which was comprised of an additional advance of $2000 and $525 for rent, and reminded them that they needed to submit receipts for the expenditures of advances. In addition to the documents previously requested, Perreault asked that Phillips-

Collins and Collins provide State Farm with the cell phone call data for four cell phone numbers for the day of the fire; copies of their utility bills from January through July 2005; and, documents regarding repairs, additions, and modifications to the Duplex since they had purchased it.

On August 9, 2005, Perreault spoke to Collins, and on August 10, 2005, he wrote Collins and Phillips-Collins.[13]  Collins received Perreault's August 10 letter which again quotes language from the homeowners' policy regarding the insured's duties after a loss and reiterated the types of documents previously requested in Perreault's July 6, and July 12, letters.  In additionally, Perreault requested that Collins and Phillip-Collins provide State Farm with a copy of the agreement for Collins's current residence; documentation regarding the rent received from the upper duplex including the lease agreement, rent receipts, tax records, or bank deposits; receipts showing how the $4,000 in advances from State Farm were spent; and, a recorded statement from Williams.

Perreault's August 10, 2005, letter requested that the documents be provided with the next 30 days.  The letter stated that after the documents were received, State Farm would request that Collins, Phillips-Collins, Phillips, and Williams give examinations under oath.

---

[13]This statement is based upon State Farm's proposed finding of fact paragraph 105 which indicates that Perreault and Collins spoke on August **10,** 2005.  Collins objected to the proposed finding as not supported by the cited factual material, exhibit 15 to the Perreault affidavit.  (*See* Pl.'s Resp. Def.'s PFOF ¶ 105.)  State Farm responded indicating that it made a typographical error and that the correct cite is paragraph 15 of the Perreault affidavit and exhibit F thereto.  (Def.'s Reply Pl.'s Resp. PFOF ¶ 105.)  Review of the corrected cited material reveals that the date of the conversation was August **9**, 2005, as established by paragraph 14, not paragraph 15, of the Perreault affidavit and exhibit F to that affidavit.  The Court has corrected the typographical error.

By August 19, 2005, Collins had responded to Perreault's August 10, letter with a handwritten document. In his August 19, response, Collins did not provide any of the requested documents and wrote that he would not provide some of the documents because he did not believe he had to and that other documents did not exist or were lost in the fire. (*See* Covelli Aff. ¶ 2, Ex. A, Collins Dep. Ex. 14.)

Between the date of the fire and September 1, 2005, Collins did not provide any of the documents requested by State Farm. On September 1, 2005, Dehler submitted Collins's proof of loss to State Farm with his letter of a retainer. Collins's proof of loss form states: "I am making a claim for $100,000+ for the damages building. (estimates may be provided at a later time[.)]" (Perreault Aff. ¶ 20, Ex. J.) On his proof of loss form, Collins indicated that he was not attaching an inventory of personal property "at this time" and that "[i]t will be submitted soon." (*Id.*) Collins's proof of loss form also states that he was "not submiting records to support a fair rental value loss at this time" but was "making a claim for $1,275 per month" for additional living expenses/fair rental value. (*Id.*)

On September 6, 2005, Perreault wrote a letter to Dehler rejecting the proof of loss as incomplete. Perreault wrote Dehler that State Farm would "unfortunately have to reject the Proof of Loss at this point as you have not included the following: a dollar amount for the structure damage or any estimates; a dollar amount or inventory for the personal property; [or] documentation supporting the fair rental value for the rental income." (Perreault Aff. ¶ 21, Ex. K.) The letter also states that State Farm "is willing to grant additional time for you to obtain

the above missing information and re-submit the Proof of Loss" and renews its prior requests for the documents (*Id.*)

On September 20, 2005, Dehler provided State Farm with: (a) Collins's monthly checking account statements for the period from June 2004 to July 2005; (b) credit reports for Collins and Phillips-Collins; (c) a copy of Collins's Nextel cell phone bill for July 2005; and, (d) three Personal Property Inventory Forms that Collins had signed. The amount claimed on the three Personal Property Inventory Forms signed by Collins was $6,210. Two of the three Personal Property Inventory Forms contain an itemization of Collins's clothing.

State Farm retained Attorney Daniel O' Brien ("O'Brien") to assist it in completing the investigation of the Collins claim. Dehler and Collins also received a copy of a September 23, 2005, letter from O'Brien which also asked that Collins re-submit a fully completed proof of loss. The letter quoted the policy's definition of "insured" and its insureds' duties after loss provisions. O'Brien's letter reiterated the requests for documents previously made by State Farm and set an October 19, 2005, date for the examinations under oath of Collins, Phillips-Collins, Andrew, Phillips and Williams.

Except for the rear bedroom including the ceiling, rear hallway including some of the ceiling, kitchen, and pantry, the first-floor duplex sustained smoke damage but not direct fire damage. Collins stated that he kept all of his clothes in the attic and not in the first-floor duplex.

On October 19, 2005, State Farm took the examinations under oath of Collins and Phillips-Collins. Andrew, Phillips and Williams did not appear for their examinations.

Collins did not provide State Farm with any additional documents before the October 19, 2005, examinations under oath.

Dehler and Collins received O'Brien's October 21, 2005, letter stating that State Farm would advance $1,000 per month until the investigation was completed. O'Brien's October 21, 2005, letter reserved all of State Farm's rights and states that "Collins agreed to provide documentation concerning the use of the advanced funds and the ALE [additional living expenses] incurred by him." (Covelli Aff. ¶ 2, Ex. A, Collins Dep. Ex. 23.)

At Collins's November 29, 2005, examination under oath, O'Brien requested a completed proof of loss form from Collins. Collins never submitted another proof of loss.

State Farm advanced Collins $1,000 per month from November 2005 through April 2006. Dehler and Collins received O'Brien's November 7, 2005, letter enclosing Sheppard's origin and cause reports. The letter renewed the request that Andrew, Phillips and Williams be produced for examinations under oath. O'Brien requested that Collins make and document all efforts to secure the attendance of Andrew, Phillips, and Williams at examinations under oath and that Collins provide the documents previously requested.

Dehler and Collins received O'Brien's November 22, 2005, letter which again requested the examinations under oath of Collins's three sons, and verification of his attempts to secure their attendance or contact information for them in the event Collins was unable to secure their attendance.

During Collins's November 29, 2005, examination under oath, Collins stated that he had made no effort since his October 19, 2005, examination under oath to have Andrew

or Williams appear for examinations under oath. Collins stated that he was not aware that O'Brien wanted to talk to Andrew, Phillips, or Williams on November 29, 2005, until that day. In such examination, Collins also stated that he had contact with Andrew in late September 2005. Collins never produced Williams or Andrew for examinations under oath.

At his August 17, 2007, deposition Collins indicated that Phillips-Collins knew how to get in touch with Andrew.[14]

Dehler and Collins received O'Brien's December 16, 2005, letter, stating that more than 30 days had elapsed since they had been provided the transcripts of Collins and Phillips-Collins's examinations under oath and that Collins and Phillips-Collins had not subscribed to their examinations or provided corrections. The letter requested that the examination transcripts be subscribed to within 30 days.

In his December 16, letter, O'Brien renewed State Farm's request for current addresses and contact information for Phillips, Andrew, and Williams, or production of them for examinations under oath; an itemization of the expenditure of the $30,981.41 mortgage proceeds; the church's bank account records for 2005; the church's books of receipts and expenditures; bank account records for any account that Collins made deposits to or

---

[14]State Farm's proposed finding of fact paragraph 142 which provides the basis for this fact does not provide a time frame for when Phillips-Collins knew how to contact Andrew. However, page 131 of Collins's deposition, cited in support of the proposed finding of fact states:

> Q: In November of 2005, what state was Andrew in?
> A: November of 2005, I believe he was living in Illinois.
> Q: How did you know that?
> A: Because his mom told me that he had moved.
> ****
> Q: Did you ask [Phillips-Collins] how she knew he lived in Illinois?
> A: Well, that's her son; they going to keep in touch with one another.

(Covelli Aff. ¶ 2, Ex. A at 131.)

withdrawals from during 2005; a completed proof of loss; copies of utility bills for the Duplex from January through June 2005; documentation of additional living expenses incurred; the application for the mortgage on the Duplex; call details for the applicable Nextel cell phones; and, income tax/homestead credit returns for 2003 and 2004.

On January 28, 2006, O'Brien wrote his opinion letter to State Farm recommending that Collins's claim be denied. O'Brien's letter states:

> [Collins] has been asked to provide additional information throughout the course of his investigation, and likewise has been asked to produce his sons for Examinations under Oath or document all efforts to do so. Those requests are consistent with his duties after a loss. Further [Collins] and [Phillips-Collins] have been asked to sign their Examinations Under Oath, as required by the policy, and have failed to so despite due notice and opportunity. We have received no evidence of an attempt to get their sons to provide Examinations Under Oath. We have received no information concerning the mortgage proceeds and nothing regarding the church's finances or any expenses concerning the ALE.

(O'Brien Aff. ¶ 9-10, Ex. E)

On February 7, 2006, State Farm conducted its claim committee conference and reached a consensus to deny the claim.

On February 9, 2006, Dehler hand-delivered a letter and documents to O'Brien. The documents included: Shabach bank statements from January 1, 2005, to July 1, 2005; expenses Collins stated that he incurred in March 2005 relating to a $5,900 withdrawal from the Shabach account on March 22, 2005; a letter authorizing State Farm to obtain Nextel call records; Collins's signed subscription pages for his two examinations under oath; a copy of Collins's homestead e-filing for 2002; We Energies bills for the Duplex; and a handwritten

receipt for $1,000 of furniture that Collins purchased from his brother-in-law. Dehler also offered to make Phillips available for an examination under oath. Dehler demanded that State Farm make its coverage determination and accused State Farm of bad faith.

State Farm decided to hold its decision to deny the Collins claim until after it took Phillips's examination under oath to determine whether it provided new information for evaluation.

Phillips's examination under oath was taken by O'Brien on February 28, 2006. On March 3, 2006, O'Brien wrote State Farm stating that Phillips's examination under oath did not change his prior opinions or recommendations. Phillips's subscription to his examination under oath was delivered to State Farm in early April 2006.

Based on the lack of information arising from Phillips's examination under oath, State Farm proceeded with its decision to deny the Collins claim.

### *Additional Facts-Collins's Perspective*

Collins has stated under oath that he does "not know how the fire started" and that he "had no involvement whatsoever in starting any fire at the property" and he has "no reason to believe that any member of his family did." (Collins Aff. ¶ 21.)

The City of Milwaukee Police Department Arson Squad investigated the Collins fire and found no evidence of accelerants to indicate that the fire was intentionally set. State Farm tested samples from a mattress, box spring frame, and floor in the area where it believed the fire originated in the back bedroom, and found no evidence of an ignitable liquid or other accelerant.

State Farm received notice of the Collins fire loss on June 28, 2005. The Collins claim was initially assigned to Cralle, an investigator of fire losses who did not work in SIU. On June 29, 2005, Cralle called the "Residence Inn. [He] told them to set up direct bill for 2 rooms." (Dehler Aff. ¶ 2, Ex. A SMF000081.)

Perreault became involved the investigation of the fire loss on June 29, 2005, when Cralle asked Perreault to perform a background investigation on the insureds. On June 29, 2005, Perreault decided to attend the cause and origin investigation scheduled for July 1, 2005. State Farm sends claims to SIU when it believes an "intensive investigation" is required. (Pl.'s PFOF ¶ 20.)

On July 1, 2005, Perreault met Collins for the first time and concluded based on his interpretation of Collins's "body language and posture and hesitancy in answering questions," that Collins "was not telling the truth about who lived at the house." (Def.'s Resp. PFOF ¶ 28 (quoting Perreault Dep. at 89:1-10).)[15] Before Perreault became involved, Cralle had met with Collins but made no mention in the claims file that Collins seemed nervous or uneasy in any respect.

On July 1, 2005, Perreault inspected the lower unit and reported that it lacked contents. After that inspection, Perreault reported in the claims file that there was only one

---

[15]Perreault's deposition transcript is Exhibit H to the Dehler Affidavit. However, that transcript begins at page 213. Thus, the Court has relied upon the excerpt of that deposition set forth in State Farm's response to Collins's proposed findings of fact.

In instances where Collins has presented a proposed finding of fact which cites one or more page of pages 1 to 212 of Perreault's deposition and State Farm asserts that the proposed finding of fact is not supported by the deposition and has not quoted the cited excerpt, the Court has omitted the proposed fact because it is not supported by citations to evidentiary materials in the record. *See* Civil L. R. 56.2(a). Likewise, when State Farm has opposed a proposed finding of fact relying on pages of Perreault's deposition which are neither included in the record nor quoted in State Farm's response, the challenged facts have been deemed undisputed because State Farm's opposition is not supported by evidentiary materials in the record. *See* Civil L.R. 56.2(b).

30

bed for seven people in the lower unit.   He also recorded in the claims file that he had done a neighborhood canvass.  Perreault's neighborhood canvass included talking with two of Collins's neighbors.

At his deposition, Perreault testified that one neighbor told him that she knew Collins did not live at the Duplex.  In the claims file, Perreault made no mention of the neighbor's statement that Collins did not live at the Duplex and, instead, reported that the neighbor told him that three to four Collins boys lived at the Duplex at the time of the fire.

After taking Phillips's recorded statement, Perreault stated in his preliminary report that Phillips said that Collins "rarely is there, at most one week out of the average month." (Dehler Aff. ¶ 5, Ex. D SFM000093.)  However, in his recorded statement, Phillips also stated that Collins "lives at 2736 North 26th Street."  (Perreault Aff. ¶ 7, Ex. A 6-7.)  During his recorded statement, Phillips also stated that Collins traveled frequently for the church, but had a room at the Duplex and stayed there "a week, week and a half out of each month."  (*Id.*, Ex. A 11.)

Perreault also reported in his claims activity log that "[Collins] said he is there 2 weeks/month but gave indications actually less."  (Dehler Aff. ¶ 3, Ex. B SMF000110.)

During his recorded statement, Collins stated "See, what, well, really I'm there every day.  I just don't stay in the house every day." (Covelli Aff. ¶ 2, Ex. 3, 12.)  Collins also stated that he was at the Duplex at least two weeks out of every month.

At Perreault's deposition, Perreault responded to questioning by Collins's counsel as following:

Q: Will you admit that the way you present the facts to your supervisor has an influence on how he views the claim?

A: Absolutely.

(Pl.'s PFOF ¶ 50 (quoting Perreault Dep. 194:14-17).)

During Collins's July 5, 2005, statement under oath taken by Perreault, the following dialog ensued:

Q. Okay. So I just want to let you know that we have a question about how the fire started. We have a question about who was living there at the time and that's going to bring into question about the additional living expenses. I just want to be up front with you, let you know that we have these questions. Umm, if its determined that no, you're not a resident there, then there's the question, would [we] be paying additional living expenses. When we look at additional living expenses, we normally like to put people up in a comparable living situation before the loss. These hotel rooms are by no stretch of the imagination comparable to what you guys had. What we would need to do is try to find something similar to, you know a two bedroom house without a stove in the area that you guys were in. That would be our monthly payment to you . . . until the investigation is done and everything is taken care of. So with that being said, would it, you know, you can stay here for another couple days, but we want to try and find you something comparable to what you guys had. You can stay wherever you want. Essentially, you know, if – the upstairs is identical to the downstairs where you were, correct? As far as space and furnishings and things like that?

A. Mm-hmmm.

Q. You're saying that you were getting $500 a month rent. Umm, that to me as long as I've been doing this area, that's typical for, you know, a two bedroom lower or upper.

A. (Wife) Mm-hmm.

Q. Um, what we would do is say okay, at some point we're going to cut off that ALE [additional living expenses] and say we're

32

going to pay you $500 a month, that should cover the rent for a similar house to what, where you were at. If you guys want to stay here, that's fine, you can do that. The most we would pay is comparable to what you guys had. Do you understand that?

A. Mm-hmm.

Q. Okay. So you can stay here if you want but in a short time period, and I'm thinking a week or so, uh, we would like to have you guys move in, you know something comparable to what you have or we would say okay, you want to stay here or elsewhere, we would just consider the additional living expenses at $500 per month and you can stay wherever you choose to stay. 'Cuz what that coverage is designed for is to keep you in your same standard of living. Umm, a two bedroom lower is not the same as these hotel rooms in this nice hotel in downtown Milwaukee. So, you know, start looking for something. If you can't find anything give me a call. We can help you out.

(Covelli Aff. ¶ 2, Ex. 3 41-42.) At Perreault's deposition, he indicated that his interview with Collins and Phillips-Collins became "more confrontational." (Def.'s Resp. Pl.'s PFOF ¶ 93 (quoting Perreault Dep. 190:17-23).) Perreault stated that the interview was not confrontational on both sides, and that he did not think he was confrontational. (*Id.*)

In a "preliminary report" to his supervisor dated July 12, 2005, Perreault summarized the July 5, 2005, dialog as follows:

The ALE [additional living expense] coverage is to allow the insureds to maintain their standard of living. The line unit TM agrees that their current accommodations are far different than their residence. Since we are paying for two rooms at about $150 each per night we have been attempting to have the insureds move out into more comparable accommodations. During our inspection it was noted that the house next door, [to the Collins property] that was not affected by the fire, has the lower unit for rent. The owner of this unit today advised that the unit is available for immediate occupancy, and the rent is $525 per month. The insured was advised that this unit was available,

comparable to his house, and that the ALE rent has been set at $525. The hotel was advised that the direct billing will be cancelled as of July 15th. In his recorded statement the insureds [sic] argued against moving out the hotel and back into their neighborhood, stating that I was "keeping the man down, in his place." The insured's [sic] were advised that currently [Phillips-Collins] was staying at the hotel when she admitted she never lived at the house, [Phillips] has his girlfriend and her children living in the other hotel room when only [Phillips] lived in the house, and nobody knew where [Williams] and Andrew were residing. They were also advised that this higher end hotel in downtown Milwaukee was not their standard of living. [Collins] has questioned if the policy will allow him to relocate in another area, and has stated that he has no desire to set up his residence in is [sic] old neighbor hood [sic].

(Dehler Aff. ¶ 5, Ex. D, SFM000096-SFM000097.)

On August 19, 2005, Perreault wrote a letter to O'Brien stating that "We should have the Cause and Origin report in the next few weeks. Our current theory is that the fire was incendiary in origin." (Dehler Aff. ¶ 6, Ex. E.)

On November 12, 2005, during a seminar sponsored by the Wisconsin Chapter of the International Association of Arson Investigators, Perreault displayed photographs of the Collins property on a large screen behind him, while discussing specifics of the Collins claim. Perreault did not refer to Collins by name or identify Collins as the insured in any manner. Among other things, Perreault said that the insured was a "mortgage flipper," had "skipped town" and that Perreault had him "dead to rights as lying on the tape" regarding the date of purchase of some computer equipment. (Pagels Aff. ¶ 12, Ex. D.) [16]

---

[16] State Farm has disputed portions of paragraph 76 of Collins's proposed finding of fact relying on pages 43 through 45, and pages 55 through 57 of Perreault's deposition. Those pages are not included in evidentiary material on file with the Court and are not quoted in State Farm's response. Thus, the challenged facts have deemed undisputed because State Farm's opposition is not supported by evidentiary materials in the record. *See* Civil L.R. 56.2(b).

State Farm produced in its claims file, a letter dated December 1, 2005, drafted by Perreault, which stated that Collins's claim was already deemed denied. "State Farm submitted an affidavit suggesting that perhaps this letter was prepared in 2006, rather than in 2005 but the letter is not clear in that regard." (Pl.'s PFOF ¶ 79.)[17]

State Farm was able to take Phillips's deposition before making the final determination to deny the claim.

## ANALYSIS

State Farm asserts that, based on the undisputed facts of record, it is entitled to summary judgment, as a matter of law, dismissing the bad faith and the breach of contract claims. Collins opposes summary judgment.

The parties tacitly agree that the substantive law of Wisconsin governs the claims in this diversity action. *See State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 669

---

There is a factual dispute between the parties as to whether Perreault also stated that "it was his view that the Collins claim was already denied." (*Compare* Pl.'s PFOF ¶ 77 and Def.'s Resp. Pl.'s PFOF ¶ 77.)

[17]Perreault submitted a supplemental affidavit stating that paragraph 27 of his original affidavit contained typographical and grammatical errors which he failed to notice when he reviewed and signed his original affidavit. He states that paragraph 27, to correctly and accurately state the facts should read:

> On or about April 7, 2006, I was advised that a decision had been made to deny the claim of Anthony and Maria Collins. I was instructed to pay the mortgagee's claim and to deny the neighbor's liability claim. On April 7, 2006, I ordered a draft payable to the mortgagee for $53,585.63 payable to Option One Mortgage and sent a letter with the check to Allocast Financial Services, LLC. This letter was misdated December 1, 2005. I used a template for the letter and failed to correct the date. I also sent another letter on April 7, 2006, to deny the neighbor's liability claim against the Collins [sic]. This letter was correctly dated April 7, 2006. My log note indicating that I sent these two letters was also dated April 7, 2006.

(Supplemental Perreault Aff. ¶ 2.)

35

(7th Cir. 2001).   Under *Erie Railroad v. Tompkins*, 304 U.S. 64, 80 (1938), this Court must apply the law of the state as it believes the highest court of the state would apply it if the issue were presently before that tribunal. *See Pate*, 275 F.3d at 669. When the state supreme court has not decided the issue, the rulings of the state intermediate appellate courts must be accorded great weight, unless there are persuasive indications that the state's highest court would decide the case differently. *Id*.

### *Bad Faith Claim*

State Farm asserts that there was credible evidence that Collins had violated the policy's intentional act exclusion, the concealment or fraud provision, and the duties of an insured after a loss provision, and, therefore, the claim was fairly debatable.  State Farm contends summary judgment is warranted on Collins's bad faith claim since an insurer needs only one reasonable basis to deny coverage and State Farm had at least three reasons for the denial of coverage in this case.

In opposing summary judgment on the claim, Collins asserts that State Farm failed to perform a neutral and unbiased claim investigation, and that, instead, State Farm concluded at an early stage that Collins was not entitled to benefits whether for additional living expenses, lost rental income, or any personal or real property damage associated with the fire.  Collins maintains that by improperly delaying and denying payment of these insurance benefits to him while knowing that it was acting unreasonably, State Farm engaged in bad faith.

Under Wisconsin law, it is well settled that if an insurer fails to deal in good faith with its insured by refusing, without proper cause, to compensate its insured for a loss covered by the policy, such conduct may give rise to a cause of action in tort of bad faith. *De Chant v. Monarch Life Ins. Co.*, 547 N.W.2d 592, 596 (Wis. 1996). The tort of "bad faith" is an intentional tort. *Anderson v. Cont'l Ins. Co.*, 271 N.W.2d 368, 376 (Wis. 1978). The tort of "bad faith" has its roots in the duty of good faith and fair dealing owed by the insurer to its insured by virtue of the insurance contract. *Id*. at 374-75.

To establish a claim for bad faith, "a plaintiff must show the absence of a reasonable basis for denying benefits of the policy *and* the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Id*. (Emphasis added). The first prong of the test is objective, while the second prong is subjective. *Weiss v. United Fire & Cas. Co*, 541 N.W.2d 753, 757 (Wis. 1995).

Under the first prong, the insured must establish that, under the facts and circumstances, a reasonable insurer could not have denied or delayed payment of the claim. *Id*. In applying the test, it is proper to determine whether a claim was properly investigated and whether the results of the investigation were subjected to a reasonable evaluation and review. *Trinity Evangelical Lutheran Church & Sch. v. Tower Ins. Co.*, 661 N.W.2d 789, 796 (Wis. 2003). Stated somewhat differently, under the first prong of the *Anderson* test, to determine whether the insurer acted in bad faith the insurer's conduct is measured against what a reasonable insurer would have done under the particular facts and circumstances to conduct a fair and neutral evaluation of the claim. *See Weiss*, 541 N.W.2d at 757.

37

Once it has been determined that an insurer has violated the objective prong of the bad faith test, it must also be determined whether the insurer has violated the subjective prong of the test. *Id.* at 762. The subjective component can be inferred from "'a reckless disregard of a lack of a reasonable basis for denial or a reckless indifference to facts or to proofs submitted by the insured.'" *Id*. at 763. (Citations omitted.)

"Under these tests of the tort of bad faith, an insurance company, however, may challenge claims which are fairly debatable and will be found liable only where it has intentionally denied (or failed to process or pay) a claim without a reasonable basis." *Anderson*, 271 N.W.2d at 376. "An insurance company cannot commit the tort of bad faith if its obligation to indemnify the insured is 'fairly debatable.'" *State Farm Fire & Cas. Ins. Co. v. Walker*, 459 N.W.2d 605, 608 (Wis. Ct. App. 1990)(citing *Mowry v. Badger State Mut. Cas. Co.*, 385 N.W.2d 171, 180 (Wis. 1986)). Whether or not the insurer ultimately prevails in denying coverage is irrelevant to whether it had a good faith basis to assert the defense. *Mills v. Regent Ins. Co.*, 449 N.W.2d 294, 297 (Wis. Ct. App. 1989).

State Farm denied Collins's claim on three grounds, concluding that Collins violated the policy's intentional act provision, the concealment or fraud provision, and the duties of the insured provision. For Collins to withstand summary judgment on his bad faith claim, the evidence construed in the light most favorable to Collins, must provide a basis from which a reasonable jury could find the absence of any reasonable basis for State Farm's denial of his claim.

*Intentional Act Provision*

Collins's arguments focus on State Farm's first ground for denial of the claim – the intentional act provision of the policy. In essence, Collins asserts that Perreault was not an unbiased, impartial investigator and State Farm did not adequately investigate the fire, and, therefore, the denial of his claim on that ground was not fairly debatable.[18] "It is the duty of an insurer to assess a claim as a result of an appropriate and careful investigation so that its conclusions should be the result of the weighing of probabilities in a fair and honest way." *Poling v. Wis. Physicians Serv.*, 357 N.W.2d 293, 297 (Wis. Ct. App. 1984). Circumstantial evidence may be sufficient for an insurance company to invoke an arson exclusion clause and deny recovery on a claim. *Walker*, 459 N.W.2d at 608. *See also*, *Mills*, 449 N.W.2d at 296-97.

State Farm maintains that its investigation of the fire was objectively reasonable indicating that in evaluating the fire, it engaged the services of an independent fire investigator, Sheppard, and an electrical consultant, Anderson, to evaluate the origin and cause of the fire, and relied upon their reports in concluding that the fire originated in the rear bedroom near the mattress and that the cause was not electrical. If there is an objectively

---

[18]Collins questions Perreault's involvement in the investigation of the fire after Cralle's initial request for a background investigation; Perreault's perception of Collins's demeanor; his recording of the results of his investigations; his probing of Collins's residency; his approach to the payment of additional living expenses; and, his inclusion of specific information about the Collins's claim (without mentioning Collins's name) in his November 2005 presentation to arson investigators. Many of these contentions relate at least in part to the subjective prong of the test for bad faith which is not addressed unless the objective portion of the test is satisfied.

Collins attempts to raise additional contentions about the preparation of the claims report which was presented to the claims committee and inadequate vetting of that report by Perreault's supervisor but those contentions are not based upon admissible evidence or evidentiary material of record in this case.

The Court need not engage in an extensive analysis of the merits of Collins's challenge to adequacy of State Farm's investigation because its determination is based on the alternative grounds for State Farm's denial of his claim which are not reasonably debatable.

reasonable basis for denying coverage, the existence of investigative flaws, standing alone, is not enough to permit recovery in tort against an insurer. *See Mills*, 449 N.W.2d at 298.

Nonetheless, Perreault shepherded the investigation and analyzed the results. Perreault acknowledged that way that he presented the facts influenced his supervisor's opinion of that claim. There is a genuine dispute of material fact about whether Perreault stated that it was his view that Collins's claim was already denied during his November 12, 2005, presentation to the arson investigators.

As of the date of the disputed statement, State Farm was still in the process of gathering information about the fire. Collins underwent a second examination under oath on November 29, 2005. State Farm did not reach its consensus decision to deny the claim until February 7, 2006. (The decision was not disclosed to Collins.) Two days later, Dehler delivered a letter and various documents to O'Brien together with an offer to make Phillips available for an examination under oath. State Farm took Phillips's examination, re-evaluated its decision, and decided to proceed with the denial of the claim. Viewing the evidence inferences in the light most favorable to Collins, given Perreault's significant role in the investigation and analysis of the claim, State Farm has not established that as a matter of law its investigation was objectively reasonable. Nonetheless, Collins has not addressed the two other grounds for denial of his claim relied upon by State Farm.

### Concealment or Fraud Provision

State Farm's second ground for denial of Collins's claim was for concealment or fraud. That provision states: "We do not provide coverage for you or any other **insured**,

40

if you or any other **insured** has concealed or misrepresented any fact or circumstance relating to this insurance, whether before or after a loss." The condition applies only to facts or circumstances "on which [State Farm] rel[ies] and are either (a) material; or (b) made with intent to deceive; or . . . which contribute to the loss."

In asserting that Collins concealed or misrepresented material facts in connection with its investigation, State Farm relies on Collins's July 5, 2005, statement that he was in Milwaukee the night before the fire and the morning of the fire. Collins indicated that he slept at the church Friday night and performed the 6:00 a.m. Saturday service there. However, three months later, during his October 19, 2005, examination under oath, Collins changed his story and stated that he was in Chicago the night before the fire and returned to Milwaukee from Chicago on the day of the fire. A material question "concerns a subject relevant and germane to the insurer's investigation as it was then proceeding." *Walker*, 459 N.W.2d at 609 (quoting *Fine v. Bellefonte Underwriters Ins. Co.*, 725 F.2d 179, 183 (2d Cir.), *cert. denied*, 469 U.S. 874 (1984) and citing *Claflin v. Commonwealth Ins. Co.*, 110 U.S. 81, 94-95 (1884)). Collins's whereabouts proximate to the time of the fire were material to State Farm's investigation of the fire. A company's determination that an insured has violated a policy's concealment clause may furnish a reasonable basis for denial of a claim. *See Walker*, 459 N.W.2d at 608. Moreover, even if a policy is subject to differing interpretations, a denial of a claim would still be fairly debatable if its interpretation is a reasonable one. *Id.* Wisconsin "has not adopted a strict liability approach to erroneous claim denials, and it is not bad faith

41

for an insurer to deny a claim on a fairly debatable claim interpretation even if that interpretation is not subsequently upheld by the courts." *Id*.

Collins also sought to collect coverage for the rent that he reported receiving before the fire but he did not satisfy State Farm's requests for documentation of claimed rental arrangements or his receipt of rent. While documentation of a lease or the receipt of rental payments may not have existed or may have been destroyed in the fire, Collins's changed responses to State Farm's requests for the name of the upstairs tenant supports State Farm's conclusion that he was concealing information about the rental from State Farm. Collins stated that Green was the upstairs tenant at the time of the fire but later he indicated that the tenant was a woman named "LaTonya." Collins also indicated that Dog occupied the upper unit.

Collins never provided any contact information for the upstairs tenant and/or occupant, and did not provide a consistent name for the female tenant of that unit. The information was material, *see id*., and the concealment prejudiced State Farm because it could have used the information to contact the tenant, to determine what the tenant knew about the fire, and to confirm the rental relationship and the amount of the rent. A company's determination that an insured has violated a policy's concealment clause may furnish a reasonable basis for denial of a claim. *See Walker*, 459 N.W.2d at 608. Despite viewing the evidence in the light most favorable to Collins, he has not raised a genuine dispute of material fact as to State Farm's determination that it had a reasonable basis to deny the claim based on Collins's violations of the policy's concealment provision.

*Duties of the Insured Provision*

State Farm's third ground for denial of Collins's claim was that Collins breached the policy's duties of the insured provision. State Farms asserts that Collins did not file a proper proof of loss. State Farm's policy required Collins to file a proof of loss within 60 days of the loss setting forth, among other things, the amount of the claim and an inventory of his damaged personal property, receipts for his additional living expenses, and documentation supporting his fair rental value claim. Within 60 days of the fire, Collins had not submitted any of the documents requested by State Farm and had not submitted any proof of loss.

On September 1, 2005, more than 60 days after the loss, Collins by his newly retained attorney, sent State Farm a signed proof of loss form which was missing information. Promptly, on September 6, 2005, State Farm advised Collins that it was rejecting the incomplete proof of loss form and offered Collins additional time to resubmit a complete proof of loss form. Despite requests of September 23, November 7, and December 16, 2005, from State Farm's counsel that Collins re-submit his proof of loss, Collins did not do so.

In contending that Collins's failure to file a proper proof of loss form constitutes reasonable basis for denial of the claim, State Farm relies on *Duir v. John Alden Life Ins.*,[19] 573 F. Supp. 1002, 1008-09 (E.D. Wis. 1983) (citing *Davis v. Allstate Ins. Co.*, 303 N.W.2d 596, 598 (Wis. 1981)), *aff'd*, 754 F.2d 245 (7th Cir. 1985). *Duir* involved an insured who sought benefits under a group life, disability, and health insurance policy, sent a hospital bill to her insurer, but did not submit a proof of loss. The court noted that the hospital bill and the

_____

[19]While the Court addresses *Duir*, because it is a federal court decision applying Wisconsin law, *Duir* is not authority for determining how the Wisconsin courts would resolve the issue.

43

other information before the insurer at that time were ambivalent as to proof of the insurer's liability for Duir's medical expenses. The insurer requested additional information from Duir within five days of receiving the hospital bill. Duir did not provide it. When Duir retained counsel, the insurer again requested additional information. But, neither Duir nor her attorney provided the information.

In addressing Duir's bad faith claim, the district court held that it was Duir, not the insurer, who had failed to comply with the insurance contract. However, *Duir* does not hold that failure to submit a proof of loss alone is grounds for the insurer to deny benefits. *Duir*, 573 F.Supp. at 1008 (citing *Davis*, 303 N.W.2d at 599), states that "substantial performance with the terms of the contract is necessary for the insured to recover under the policy. Where a party has met the essential purpose of the contract, he has substantially performed under the contract." The *Duir* holding is based on the insured's failure to provide sufficient information for the insurer to determine its liability and to respond for requests for additional information, not her failure to file the proof of loss alone.

*Fehring v. Republic Ins. Co.*, 347 N.W.2d 595, 599-600 (Wis. 1984) (overrruled on other grounds by *DeChant*, 547 N.W.2d at 598-99), which addressed the failure of an insured to file a proof of loss as a defense to a bad faith claim for water damage on a homeowner's policy, emphasizes that the purpose underlying such notice requirements is to provide the liability carrier with an opportunity to investigate possible claims against the policy. *Id.* at 600 (citing *Gerrard Realty Corp. v. Am. States Ins. Co.*, 277 N.W.2d 863, 869 (Wis. 1979)). The Wisconsin Supreme Court noted that in *Gerrard*, the insurer was prejudiced

as a matter of law, because the insured's 22-month delay in providing notice prevented the insurer from investigating the claim. *Fehring*, 347 N.W.2d at 599-600. However, with respect to the Fehrings, the court found no prejudice because the Fehrings had contacted the insurer almost immediately after discovering the damage to their home. *Id*. at 600. The insurer responded by sending an adjuster to investigate the damage the following week. *Id*. The court held that the notice requirement was fulfilled by the insured's immediate communication with the company, and that the insurer was given the opportunity to sufficiently investigate the claim. *Id*.

Like the insureds in *Fehring*, Collins contacted State Farm almost immediately after the fire – State Farm received notice of the June 25, 2005, fire on June 28, 2005. Three days later, State Farm's investigator examined the Duplex, fulfilling the notice purpose of the proof of loss. Thus, to the extent that State Farm asserts that Collins's failure to submit a proper proof of loss form, alone, establishes a material breach of the insurance contract, its contention is not supported by Wisconsin law.

In contending that Collins's claim should be denied under the cooperation clause because he did not file a proper proof of loss, State Farm also cites *Employer's Mut. Cas. Co. v. Skoutaris*, 453 F.3d 915, 925 (7th Cir. 2006), which states that "the contract does not allow the [insured] to ignore his express duties because he felt he had done enough." *Skoutaris*, a diversity case, involved the application of the substantive law of Indiana, not Wisconsin law.

Furthermore, the statement is taken out of context. It addresses a breach of an examination under oath clause, not a cooperation clause. *Skoutaris* applies a 2006 Indiana

Supreme Court decision, *Morris v. Econ. Fire & Cas. Co.*, 848 N.E.2d 663, 666 (Ind. 2006), which held that breaches of examination under oath clauses no longer required a showing of prejudice; rather an insurance company only needed to show a material breach to prevail. *Skoutaris*, 453 F.3d at 924.

In arguing that Collins breached the cooperation provision, State Farm also asserts that Collins did not comply with the examinations under oath provisions of the policy because he did not produce Andrew or Williams for examinations under oath. State Farm relies on *Walker*, 459 N.W.2d at 608, which held that an insured was not entitled to compensatory damages because he breached the concealment clause of the policy by refusing to answer some questions during an examination under oath. It also relies on *Skoutaris*, 453 F.3d at 924.[20]

State Farm's policy required that Collins produce members of his household for examination under oath to the extent it was within his or Phillips-Collins's power to do so. State Farm made multiple requests for examinations under oath. By letter dated September 23, 2005, O'Brien set an October 19, 2005, date for several examinations under oath including those of Andrew and Williams. On November 7, and November 22, 2005, O'Brien sent letters renewing his requests for the examinations under oath of Andrew and Williams. Both November 2005, letters requested that Collins verify his attempts to secure their attendance or provide contact information for them in the event that Collins was unable to secure their attendance. Collins and Dehler received copies of those letters.

---

[20]Again, State Farm errs in relying on *Skoutaris*, because it applies Indiana law.

Despite receiving those letters, at his November 29, 2005, examination under oath, Collins disavowed any prior knowledge that State Farm wanted to conduct examinations under oath of Andrew and Williams. Collins had contact with Andrew in late September 2005. Collins was also aware that Phillips-Collins also knew how to get in touch with Andrew in November 2005.

Examinations under oath of Andrew and Williams were material because those examinations could have assisted State Farm's investigation of the fire, its identification of the residents of the Duplex, including the upstairs unit tenants, and its determination of the contents of the first-floor unit. Andrew was the last person inside of the first-floor unit before the fire. State Farm's ability to investigate the Collins claim was prejudiced by the lack of these examinations. Collins's failure to produce Williams and Andrew, to make efforts to arrange for their examinations under oath, or to document his efforts to do so or to provide contact information for either of them establishes that State Farm had a reasonable basis for denial of Collins's claim on that ground.

Despite viewing the evidence in the light most favorable to Collins, he has not raised a genuine dispute of material fact as to State Farm's determination that it had a reasonable basis to deny the claim based on Collins's violation of the policy's duties of the insured's provision.

State Farm reasonably determined that Collins breached the policy's concealment provision and breached its obligations of the insured's provision by failing to minimally comply with his obligation to arrange, or document his attempt to arrange, the

examinations under oath of Andrew and Williams. Those breaches were material and prejudiced State Farm. Since Collins has not shown the absence of a reasonable basis for State Farm's denial of his claim, his bad faith claim is dismissed.

### *Breach of Contract Claim*

State Farm asserts that based on Collins's failure to comply with the duties of an insured after a loss provision of the policy, his breach of contract claim should also be dismissed. State Farm maintains that Collins failed to submit a proper proof of loss, failed to comply with the examination under oath provisions by producing his sons, and failed to cooperate with establishing his additional living expenses and fair rental value claims.

Collins maintains that State Farm is not entitled to summary judgment based on any alleged breach of his duties under the policy because State Farm's failure to do a proper claims investigation breached its duties under the Policy including its implied duty of good faith and fair dealing. He states that State Farm also breached its duties to pay him additional living expenses and lost rental income benefits. Collins asserts that as a consequence of State Farm's own breaches of its duties, State Farm cannot expect to hold the insureds to their contractual duties.

The interpretation of an insurance policy presents a question of law. *State Farm Mut. Auto. Ins. Co. v. Bailey*, 734 N.W.2d 386, 391 (Wis. 2007). Construing the provisions of an insurance policy requires an examination of the specific provisions at issue and an assessment of whether contextual ambiguity exists. *Id*. "General principles of contract construction control the interpretation of an insurance contract." *Id*. (citations omitted).

48

Discerning and giving effect to the intent of the parties is the objective. *Id.* Toward that end, courts give the common, ordinary meaning to the policy language (i.e., what the reasonable person in the insured's position would understand it to mean). *Id.* Any ambiguity that may exist is construed in favor of the insured, while exclusions in coverage are narrowly construed against the insurer. *Id.* Ambiguity arises if the language of the policy is "susceptible to more than one reasonable construction." *Id.* The resulting interpretation of the policy's language "should advance the insured's reasonable expectations of coverage." *Id.* (quoting *Taylor v. Greatway Ins. Co.*, 628 N.W.2d 916 (Wis. 2001)).

For an insured to recover under the terms of a policy, substantial performance with the terms of the contract is required. *Davis v. Allstate Ins. Co.*, 303 N.W.2d 596, 599 (Wis. 1981). Where a party has met the essential purpose of the contract, he has substantially performed the contract. *Id.*

### Concealment Provision

The policy provides that "We do not provide coverage for you or any other **insured**, if you or any other **insured** has concealed or misrepresented any fact or circumstance relating to this insurance, whether before or after a loss." However, the condition applies only to facts or circumstances "on which [State Farm] rel[ies] and are either (a) material; or (b) made with intent to deceive; or . . . which contribute to the loss." Collins does not contend that the policy is ambiguous.

This Court has concluded that State Farm's denial of Collins's claim under the

49

concealment provision is reasonably debatable providing a basis for dismissal of Collins's bad faith claim. Collins breached the concealment provision of the contract because he concealed facts regarding his whereabouts the day before the fire. Collins's location around the date of the fire were material to State Farm's investigation of the origins and cause of the fire. However, the policy also provides that State Farm must rely on the facts and circumstances that have been concealed or misrepresented. Whether and how State Farm relied upon Collins's concealment of his whereabouts is not articulated by State Farm or apparent from the evidence. Therefore, State Farm has not established that such concealment breached the contractual concealment provision.

However, Collins also concealed information regarding the identity of the upstairs tenant which was material because Collins claimed a monthly loss of $525 in rental payments from the upper unit. State Farm's payments to Collins of $1,000 per month from November through April 2006, while not specifically allocated to fair rental loss, reasonably indicate State Farm's reliance upon Collins's ongoing claim of lost rental income – a claim which State Farm could not verify or refute. Based on the contractual language, State Farm was entitled to deny Collins's claim due to its finding that he violated the concealment provision by concealing information regarding the identity of the upstairs tenant. Although the Court has viewed the evidence in the light most favorable to Collins, he has failed to raise a genuine dispute of material fact regarding that determination. Thus, Collins's breach of contract claim is subject to dismissal upon summary judgment.

However, State Farm also relies upon Collins's breach of the cooperation clause as a basis for denial of coverage and dismissal of his breach of contract claim. Therefore, the Court will address that contention.

*Breach of Cooperation Clause*

The Wisconsin Supreme Court has stated that the insured's duty of cooperation "will not be interpreted as technical traps denying a worthy plaintiff recovery." *Dietz v. Hardware Dealers Mut. Fire Ins. Co.*, 276 N.W.2d 808, 812 (Wis. 1979). Notwithstanding proof of a breach of a cooperation clause, Wisconsin law requires that an insurer also prove the breach is material and prejudicial. *Id.* (citing *Kurz v. Collins*, 6 Wis.2d 538, 549, 95 N.W.2d 365 (Wis. 1959)).

In discussing the elements of materiality and prejudice, the Wisconsin Supreme Court has explained:

> When it is stated that a false statement or testimony must be material in order to breach a policy co-operation condition, it means that the same must be material to the issue of the liability of the company on its policy. In a sense, whether a false statement or testimony is material to the insurance company's liability on its policy is closely akin to whether the company has been prejudiced thereby, but we deem materiality to be broader in scope than prejudice.

*Id.* at 812 n.3 (quoting *Kurz*, 95 N.W.2d at 370).

The evidence before the Court establishes that Collins breached the cooperation clause of the policy by failing to produce Williams and Andrew for examinations under oath, to document his efforts to produce them, or to provide contact information for either of them.

51

Phillips-Collins was aware of how to contact Andrew as of November 2005. Collins also knew that Phillips-Collins had that information.

The breach was material because State Farm was attempting to determine who resided in the lower unit, the contents of that unit, and the identity of the tenants of the upper unit. Examinations under oath of Williams and Andrew could have disclosed useful information to State Farm in its inquiry into those matters. As the last person who was present inside the lower unit, an examination under oath of Andrew could have provided material information which would have assisted State Farm in its investigation of the fire. Furthermore, State Farm's inability to take those examinations prejudiced State Farm's ability to investigate Collins's claim. Thus, Collins's breach of the cooperation clause was material and prejudicial. Viewing the evidence in the light most favorable to Collins, he has failed to raise a genuine issue of material fact regarding that determination. Thus, that breach is also a basis for State Farm's denial of coverage and provides an additional basis for summary judgment dismissing Collins's breach of contract claim.

Given this Court's conclusions, it declines to address Collins's counter-arguments at great length. However, it notes that many are underdeveloped and lack the support of case law. At this juncture, Collins has not established that State Farm failed to do a proper claims investigation. State Farm paid monies to Collins while investigating the claim. Initially State Farm paid Collins $4,525. State Farm also paid the Residence Inn directly for the cost of two rooms until July 15, 2005, and paid $1,000 per month from November 2005, until April 2006, when Collins's claim was denied. Furthermore, given Collins's breaches of

52

other provisions of the policy, the Court need not address Collins's arguments that he was not required to submit a proper proof of loss form.[21]   Collins's breach of contract and bad faith claims are dismissed.

### *Phillips-Collins's Claims*

With respect to Phillips-Collins, who has not responded to State Farm's proposed findings of fact, State Farm has established as a matter of law that it is entitled to summary judgment dismissing her breach of contract and bad faith claims.   Therefore, those claims are dismissed.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

State Farm's motion for summary judgment dismissing Collins and Phillips-Collins's breach of contract and bad faith claims arising out of the denial of their insurance claim due to June 25, 2005 fire of property located at 2736-37 North 26th Street, Milwaukee, Wisconsin (Docket No. 37) is **GRANTED**;

This action is **DISMISSED**; and,

---

[21]Collins maintains that State Farm's contention that his proof of loss was deficient is erroneous because Wisconsin's "valued policy" law, Wis. Stat. § 632.05(2), provides that in this situation Collins was entitled to the policy limits for the real property damage and, therefore, the estimated cost Collins placed on the property damage is irrelevant.  Additionally, Collins states that, even if his damage estimate was material, State Farm has failed to show how it was harmed or prejudiced by Collins's estimate that the damage was in excess of $100,000, citing *West Bend Co. v Chiaphua Indus., Inc.*, 112 F.Supp. 816, 825 (E.D. Wis. 2000).  Collins also argues that State Farm has not shown that it sustained any prejudice in the delay of his personal property forms, as required by Wis. Stat. § 631.81. Further, argues Collins, albeit without citation, that even if State Farm could prove a material breach of a policy provision and that it sustained prejudice, this should at most only result in denial of the personal property claim, not the entire building claim. Collins also asserts that State Farm's own proof of loss form gives the insured the option of not providing documentation to support a claim for additional living expenses or lost rental income.

The Clerk of Court is **DIRECTED** to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 28th day of February, 2008.

                    **BY THE COURT**


                    **s/ Rudolph T. Randa**
                    **Hon. Rudolph T. Randa**
                    **Chief Judge**